18-1-1-1-6 Sunpreme v. United States We're ready whenever you are, and you've got to tell me how to pronounce your name, please. Good morning, Garner. Can you speak up a little bit, please? Yes. Can I ask a question at the beginning? The briefs are marked confidential, and yet I don't see any highlighting. How do I know what it is on which page is confidential? Point to me with one page and show me something that's confidential so I know how to find it. Yes. So, for example, at page 171 of the appendix. Page which? 171. Of the appendix. Okay. Yes. Is there anything in the brief? There are a few references in the brief regarding the measurements on the thin films of amorphous silicon and a few of the findings made in a report of the sunbeam cell by the Evans Analytical Group that are bracketed and are... And on page 171 of the appendix, I don't have my... How is it marked? Is it colored or... Garner, yes. It's marked. For example, this is the actual page and... Is it marked in yellow? Yes, it's marked in yellow. Marked in yellow. You said there's some things in the brief itself, the content of the brief, that are marked confidential because I'm not seeing those. I'm seeing on pages 46 and 47, there's bracketed material in the brief, for example. Of the blue brief? Right. Of the blue brief. 46 and 47. Yes, Your Honor. That's correct. And those are probably the only references in the brief that are bracketed because it's very limited, the material that's confidential. We're going to start your clock running again. Thank you. Thank you. Suncream challenges a scope ruling by Commerce, finding that Suncream cells, which contain amorphous silicon thin films on a crystalline silicon substrate, are within the scope of the anti-dumping countervailing duty orders on crystalline silicon PB cells from China. So, if it pleases the court to turn to page 171 of the appendix, it provides a diagram of the Suncream cell that identifies the various layers of the semiconductor materials. It is the same diagram. It's also in our brief on page 13. 13, yes. So, as your honors could see, there are four layers of amorphous silicon thin films in the Suncream schematic. There is one layer that is P-doped. It has positive charges. One layer that is N-doped. It has negative charges. And there are two intrinsic layers, the so-called I-layers. And there is also the crystalline silicon substrate, which is also doped with N-doped. Isn't the question whether P-I-N junction is within the scope of the order, and isn't the answer that the order says P-N junction formed by any means, regardless of the method of manufacturing or addition of materials to collect electricity? Yes, sir. And the presence of the intermediate amorphous layer doesn't prevent the transmission or collection of electricity. So why wasn't the order properly inclusive of the P-I-N material? Well, your honor, the starting point should be the language of the order itself. And the language of the order itself mentions crystalline silicon cells containing a P-N junction. It doesn't say any junction. And P-N junction formed by any means, formed by any means is a modifier to the term P-N. So P-N formed by any means cannot mean a different type of junction. There are two types of junctions in general. There is a P-N junction and a P-I-N junction. They are chemically different. One has an additional layer, the intrinsic layer. And they are defined differently. So we don't believe that commerce needed to interpret this term. P-N junction is not an ambiguous term. Commerce made the legal decision to interpret P-N junction. But there was no need because there are definitions on the record, including in the K-1 sources, such as the glossary to one of the amendments to the petitions, one of the P-N junction and P-I-N junction separately. So when commerce went ahead and... Your basic argument is that P-N junction in the order is describing a structure, not a function. Correct, Your Honor. Why is that necessarily so? Because this is how they are described in dictionary definitions. There are dictionary definitions provided by petitioners. There are dictionary definitions provided by... Your submission saying is that a P-N junction functions like a P-N... Like a P-I-N junction functions like a P-N junction. Well, that is not what was discussed at any point. That is not what the order said. That is not what the ITC says. That is not what the petition said. It would have been very easy for... It said formed by any means? Yes. Well, formed by any means doesn't change the fact that it must still be a P-N junction. It doesn't... Formed by any means doesn't change the nature of the junction, doesn't make it into a different type of junction altogether as a P-I-N junction is. Commerce found that the evidence on the record does not support the allegation that the P-N layers must be adjacent or within a crystalline silicon wafer to form a P-N junction. Don't we owe deference to that finding by Commerce? Your Honor, that finding by Commerce is based on a prior scope ruling on a product called TREEx, the TREEx cell. In the TREEx ruling, this particular sentence that a P-N junction, this finding that a P-N junction is an umbrella term, is provided without any citation, is provided without any support in scientific literature, in a dictionary, or anything. So that in itself renders this one determination to be unsupported by the evidence. But again, as this court had said in Duferco, K-1 sources cannot substitute for words in the anti-dumping order itself. And the anti-dumping order itself talks about a P-N junction, not a P-I-N junction. But TREEx becomes a K-1 source, right? Yes, TREEx is a K-1 source. Because it's a prior scope ruling? Yes. But again, a K-1 source cannot substitute for language in the order, and a K-1 source is not binding on commerce, where it relies on interpretive criteria. But a K-1 source can clarify language in an order. It can, but in this case, in the TREEx situation, commerce did not consider the definitions that we are arguing, on some PREEMS records. On some PREEMS records, we have provided definitions from the Department of Energy. We have cited two definitions from the glossary of the petition that suggest P-N junction and P-I-N are different structures and are created differently with different materials. These are all sources that commerce did not consider in TREEx. So when we are arguing that the determination in TREEx cannot have this fundamental precedential value for some PREEMS, it is because the record is different. And the argument here is based on additional information that had not been considered in TREEx. And the other problem with commerce's interpretation of the term P-N junction is that it essentially renders the term meaningless. So if commerce interprets P-N junction to mean any junction, essentially it becomes superfluous. This court in King Supply has indicated that scope language must be interpreted in such a way that it is informative and non-superfluous. Well, if we say any junction, that doesn't help us at all identify the subject merchandise that is under this order. If I may turn to commerce's determination regarding the role of the wafer in some PREEMS cell. In its scope ruling, commerce found that some PREEMS cell is a crystalline cell because it contains a wafer, a crystalline wafer, and the crystalline wafer has a primary role. And that was described by commerce as it is the primary solar absorber. There are several problems with this argument. The first is that the solar absorber criterion doesn't appear in the scope itself. It doesn't appear in the petition, in the ITC reports, or in commerce's investigations. And moreover, the solar absorber criteria was brought up in the TREEx case. And in that case, commerce said, well, this is not a criterion that we should rely on to define CSPB cells because it was not part of any of the K1 sources. So commerce's reliance on solar absorber in such a strong fashion for some PREEMS is in contrast with commerce's disavowal of this criterion altogether in the TREEx cell. The second problem with the solar absorber determination is that commerce said, well, some PREEMS is a crystalline cell because the wafer is the primary solar absorber. Now, commerce couldn't have said or determined it's the primary absorber without analyzing what are the other components of the cell. Commerce didn't look, didn't consider at all what is the role of the amorphous silicon thin films. And in fact, the information on the record shows that amorphous silicon thin films also absorb electricity, also absorb sunlight, and they're actually very efficient at doing so. So essentially, commerce had no basis to make this qualitative determination between the wafer substrate and the amorphous cells, the amorphous thin films, without conducting any analysis of the amorphous silicon thin films. So that, in our view, renders its determination unsupported by the evidence. Another very important point that commerce emphasized in finding these cells to be crystalline is that they have an active wafer. That's how commerce described it, an active or doped wafer. It is correct that the wafer in the SunPREEM cell is doped, but all wafers that are used in semiconductors industry, all crystalline wafers that are used as the starting point for a solar cell, are naturally doped from their production process. And this is borne out by the description in the petition. So SolarWorld, in the petition, described the production process for the wafer. And it said, essentially, that the crystalline is, in the first stage, the crystalline is grown with the addition of a dopant. And they explained boron is one of the dopants that are being added. To provide a positive orientation to the crystal, which is then formed into ingots and cut into wafers. But the important part that I wanted to get to is that SolarWorld itself clarified that simply a silicon wafer that has a positive orientation, that is doped, is no more capable of converting sunlight into electricity than a sliver of river rock. This sliver of river rock, to paraphrase SolarWorld, is the same wafer that is being used by SunPREEM. So Commerce cannot, at the same time, credit the petition to say, credit the petition in the sense that a doped wafer is nothing more than a sliver of river rock, and then find in SunPREEM's case... Can I just ask a question about the accumulation of the facts here? I realize that there is a scope investigation here that Commerce felt it could do under K-1, even though in TRIACS, dealing with exactly the same order, they said we can't do it under K-1. We have to go to K-2 sources. And then what they do is flip TRIACS, turn it into a K-1 source, and burden you with it. I get that. But I read the opinions below in the case that led to the appeal that was here earlier on the jurisdictional issue. And in the opinion below, in that case, there was a lot of description about testing that was done by Customs in cooperation with your client, I believe, San Diego, a few other places. Yes, yes. Were any of those, and those test results are all redacted in the opinions that I've been able to read, so I don't know what happened. I don't know what Customs people found. Is any of that information carried over into the scope hearing? Yes, Your Honor. In SOMPREME's scope ruling request, so the first document on the record to initiate the case, we have provided a copy of that report, of a laboratory report by Customs. Is that in our record? Because I would just be curious to know when the initial testing was done, what were the findings? Yes. And when the initial testing was done, Customs took samples of SOMPREME wafers that were processed at different levels of processing, and essentially they found there is an amorphous silicon thin film component, but they could not identify it because it is too small. They did not have the right technology, the right equipment to do so. And this is why in our scope ruling, we have provided a laboratory report from a group that specializes in analysis of semiconductor materials, and it's provided in our scope ruling request. And that analysis identifies all of the layers of the cell, and which of the layers are doped and which of the layers, the fact that the amorphous silicon layers are highly doped, and the crystalline silicon wafer is doped, but it's slightly doped. It's not the active layer of the junction. We've run through your rebuttal time, but we'll restore some time. Thank you. Good morning. You're Mr. Miller, and you've got 10 of your 15 minutes. Thank you, Your Honor. May it please the court. Commerce's determination that SOMPREME cells are covered by the scope of the orders should be sustained because Commerce followed the regulatory framework for issuing scope rulings, and its findings are supported by substantial evidence. Separately, the trial courts setting aside of Commerce's instructions regarding the implementation of this determination should be reversed because Commerce's instructions, again, mirror the regulatory framework and merely instruct CBP to suspend liquidation of the entries from the commencement of the scope ruling on a going-forward basis for those entries that had not been previously suspended, and for those entries that had been previously suspended, the instructions, again, follow the framework of the regulation and request that the suspensions continue. I'll begin with the scope determination. That's assuming the original suspension was legitimate. That's your cross-appeal. Well, no, Your Honor. That is our cross-appeal. The last piece of what you were saying is your cross-appeal. Yes, Your Honor. Maybe you ought to separate it and deal with the direct appeal first. Certainly. With respect to the affirmative scope determination, looking first at Commerce's determination that SOMPREME cells meet the criteria of crystalline silicon photovoltaic cells, Commerce's determination is supported by the regulatory framework because pursuant to 19 CFR 351. Why don't you deal with the PIN-PIN connection? Certainly, Your Honor. Respond to the argument that your adversary has made. First, what's crucial to the scope language, and the scope language is the first criteria that this court looks at in terms of interpreting the language of an order, is that it is a P and N junction formed by any means. With respect to the SOMPREME ruling, Commerce considered the plain language. Let me ask you a question. Is that a structure or is that a function? When they say a PN junction, is a PN junction a thing that can be identified in science? It is, Your Honor, yes. But Commerce also considered the function of it, and this is reflected in the triax. That's why I asked by any means. Certainly, Your Honor, yes. When Commerce interpreted the phrase by any means, it considered the functionary role of a junction, and this is reflected at pages. But I guess what's troubling me, and your friend referred to it, is in the triax, Commerce says it encompasses different types of junctions, including a PIN and junction. Isn't that reading PIN out of the words? If it's any junction, including PIN, is that the same as a PN and junction? I mean, the language says PN and junction. Effectively, yes, Your Honor. So a PN junction is any junction? No, Your Honor. It's any junction if it's created in a certain way. Certainly, Your Honor. Doesn't that, again, as your friend points out, leave those words out as a limitation? No, Your Honor, and here's why. There's two essential criteria to it. What was the exact finding in triax as to the PN junction? So if we look at the triax scope ruling at pages 17 to 18, there's two criteria that Commerce considered for purposes of whether a junction falls within the scope of this order. One, it must be essential to the creation of the electrical field, and Commerce looked at both a traditional PN junction as well as a PIN. The Chief Judge just referred to the language where they were talking about PN junction and a PIN junction in the same sentence. Yes, Your Honor. Commerce interpreted PN junction formed by any means as an umbrella term to encompass a PIN and junction, and if we look at this proceeding. Yes, Your Honor. In triax. Well, both in triax and in sun cream. What was the language? It's at 884. Different types of junctions including a PIN and junction. Different kinds of junction included. Yes, Your Honor. And that suggests it's a different kind of junction? It's a subset of a PN junction. When Commerce was interpreting the entirety of the phrase P and N junction formed by any means, it looked at two essential criteria. One, that the junction was essential to the creation of the electrical field, and here when you look at both the P and N junction versus the PIN junction, both junctions are essential to the creation of that electrical field. And Commerce concluded, again, this is at triax at 18, that the PIN junction simply extends the electrical field over a wider range of the cell. So in terms of interpreting the scope language, P slash N junction formed by any means, Commerce interpreted it to include as an umbrella a term heterogeneous junctions, and that is supported by the record and also supported by other K1 sources. So if we look at the triax ruling at 31, Commerce also considered the ITC investigation. It considered the petition. In particular, I'm looking at triax at 32, citing the petitions at 7. Based upon the petitions, Commerce determined that a P and N junction formed by any means can interpret it to capture heterogeneous junctions, homogenous pattern P and N junctions, hetero junctions. So that's from the petition. They looked at that K1 source in terms of interpreting what a P slash N junction means. And based upon that K1 source, as well as the ITC investigation, as well as the plain language of the scope itself, the fact that it says formed by any means, Commerce interpreted the entirety of the phrase, P slash N junction formed by any means, to be this broader umbrella term. And that's supported by the regulatory framework. Now, P is positive, right? Yes, Your Honor. And N is negative. Yes, Your Honor. And what's the I? Intermediate? I is intrinsic. Intrinsic. Certainly, Your Honor. And if we go back to the appendix, page 171, which reflects the diagram that my colleague was referring to earlier, you can see that the crystalline silicon substrate, which is that middle layer, has N slash SI, meaning it has a negative charge to it. And this is the doping that my colleague was referring to. So the fact that there's a negative charge to the crystalline substrate shows that it's an active component of the cell. And this was critical for Commerce to conclude that the sun cream merchandise was within scope. There are two criteria that Commerce interpreted for these cells to be included within scope for purposes of being a crystalline silicon photovoltaic cell. And one, it has to contain crystalline silicon, which we see by the diagram that it does. But second, the cell must use, must rely upon that substrate to generate electricity. And the record reflects that, in fact, the silicon substrate in sun cream cell relies upon that substrate in order to generate electricity. You can look at the petitioner or the sun cream's blue brief at 31 to 9, where sun cream admits that it's a semiconductor, the substrate that absorbs light. And also, if we look at the appendix at 778, the appendix at 4576, and the appendix at 828, all those three pages reflect statements by sun cream that says that the crystalline substrate enhances the functioning of the amorphous silicon. So based upon that record evidence, Commerce reasonably concluded that the silicon substrate was active. And because it was active, it contributed to the generation of electricity, and therefore sun cream cells fall within the scope of the order. Yeah, I'm going to ask you to turn to the cross appeal. Yes, certainly, Your Honor. And frankly, I'm finding it very challenging to even understand what the issue is and also what the government's position is. Certainly, Your Honor. So there were two groups of entries that existed at the time that Commerce drafted its instructions. Some entries were suspended, and some entries were not suspended. In order to instruct customs as to how to implement this affirmative determination, Commerce drafted its instructions to mirror the regulatory framework. And specifically, I'm looking at 19 CFR 351.225L1, 2, and 3. And if we look at that regulatory framework, what that tells us is if we look at L1, it says when Commerce conducts a scope inquiry and a product in question is already subject to suspension, Commerce is directed to continue the suspension pending a preliminary or final scope ruling. Then if we turn to paragraph 2. There's no question here about what happened, and there was a lot of product that was actually in suspended liquidation. The importer had paid the duties. This was after the decision and a lot of back and forth on customs trying to figure out exactly whether these things were in or out. And so we know what we're talking about. The question here is whether or not under Xerox and in the previous appeal that was here in which the court here held that there was no jurisdiction under A because there hadn't been a ministerial act by customs or been an interpretive act. The question is whether or not the previous suspension liquidation that you would like to be able to hark back to is legit. Well, I would respectfully disagree, Your Honor. We can actually review the propriety of Commerce's instructions here without actually even looking at customs actions. And here we know that Commerce's instructions are in accordance with law because the language mirrors the framework of the regulations. Well, let me just ask you this question. If indeed customs acted in an ultra-various fashion in suspending a liquidation, would that be legitimate? Well, with respect to customs actions, it may not be, but that's irrelevant. We know what Judge Kelly said in her opinion, right? And we know the basis for it. What's your response to that? We know that it has already been held that this particular order was ambiguous and needed to be clarified. The trial court did render that determination. We know that. And we said that in our opinion was up here earlier. That the order was ambiguous? The parties agreed the order was ambiguous. Well, I don't believe that this court actually rendered an affirmative determination as to the ambiguity. I think it was simply expressing what the recourse to Suncream would be if, in fact, it found ambiguity to the order. But I would draw your attention just to two critical citations. I know I'm eating into my colleague's time. Here, the parties in CIT recognized that a dispute exists over the scope and application of the orders. Certainly, there was a dispute between Suncream and the United States as to the ambiguity of the order. Suncream viewed it to be ambiguous. And they cite Judge Kelly's opinion at 1285 where she said it was ambiguous. Certainly, Your Honor. Yes, the trial court did render a determination that it was ambiguous. So is it your view, is it the government's position that we make a decision up front as to whether or not something's unambiguous or ambiguous and that customs can only act if it's unambiguous? Are you buying that whole thing? The court doesn't even need to engage in that analysis for purposes of this case. And the reason why it doesn't is AMS… Well, do you think it's wrong or do you think it's right? Do you think it would be wrong if we said that that's the test? That if an order, if it's unambiguous, then customs can go ahead and act. But if it's ambiguous, it cannot… No, Your Honor. That should not be the test that this court should apply. U.S. Customs and Border Protection serves a very, very critical role. And this is what was at issue in our prior appeal in terms of their law enforcement capabilities at the order. When goods come across the border of the United States… The border? I thought you said the order. The border. I'm sorry. When goods come across the border of the United States, customs must protect the public fits, must protect the revenue. So when goods such as sun creams come in and customs suspects that they're subject to an order, customs did some preliminary testing, but ultimately determined that as a preliminary determination, it should be subject to the scope of the order and requested sun cream to enter its merchandise as subject to the orders which resulted in the suspensions. Ultimately, commerce agreed with U.S. Customs and Border Protection and it rendered its affirmative scope ruling here in this instance. But we shouldn't look at commerce's actions for purposes of assessing the propriety of commerce's instructions. Here, commerce's instructions merely… But our case law draws a distinction between commerce, between customs acting in a ministerial faction and acting in an interpretive faction. That's Xerox. Well… Is that correct? The case law does draw that distinction. Yes, Your Honor. Xerox draws that distinction, right? Yes, Your Honor. And if customs is acting in a purely ministerial fashion, then when the importer protests the decision to suspend the liquidation, that decision is appealable under A. Well, if… Yes? Yes and no. I think you're… It's a bit confusing because you used the word… This is very technical. Yes, I know. So I have a situation where the product comes in and customs says, we think… We have an existing suspension of liquidation order that was given to us when the original proceeding was done. And customs says, we think you're within the order and we're going to therefore require you to pay the duty. And the importer pays the duty. But the importer thinks that they are clearly outside the scope of the order. This court held in the prior Sunpreme decision that the recourse for the importers to Sunpreme is to seek a scope ruling from commerce, not to challenge commerce… No, no. Xerox says when you're when in doubt, you don't need to seek a scope hearing if it's clear. Well, Xerox is distinguishable from the circumstance of this case because there, there was a factual misapplication of the order by customs. We don't have that circumstance here. Here we have a straightforward, vanilla issue of whether the product should be… We agree that we have case law that draws a distinction between customs acting ministerially and customs acting in an interpretive fashion. There is this distinction between A, case law, and C, case law. And what are the consequences of that difference? I think the prior decisions of this court still stand. What are the consequences? What are the consequences when customs acts ministerially? The recourse for the importers to seek a scope ruling from the Department of Commerce. No, no, no. They act ministerially. Well, when they're acting ministerially… Xerox says you can then complain and go directly to the CIT under A, on 1581A. Yes, Your Honor. If there's been a factual misapplication. But in that context, customs wouldn't be acting ministerially. They would be actually engaging in a decision that could be challenged under the administrative protest remedies. And I think that's where our disconnect is. It wasn't factual. The question in Xerox, the question is whether or not there was any reinforcement in the tire. That was a factual inquiry. That was the… Well, that's a factual inquiry as to whether or not the goods here fall within the order. There was a factual inquiry here, right? Customs did engage in a preliminary analysis, yes. They left off to San Diego because they had the factual inquiry. I'll just end with this. I think the critical distinction here between this customs case law and the commerce case law… You really don't want to engage the consequences of what happens when customs is not acting ministerially. Yes, Your Honor. And there, the recourse is to protest those actions and bring an action before the trial court under 1581A. But that's not the circumstance here, right?  merchandise fall within the scope of an order. That's a classic scope ruling. And Congress has delegated that authority to commerce in order to make that determination. And that's what this court's original decision in Suncream… Right, but the question is what do the words already subject to a suspension of liquidation mean? What do they mean in the context of an instance in which customs was not acting ministerially? Well, in this instance, we don't need to look at customs actions and assess whether they're acting ministerially or not. Well, we know they were not acting ministerially because we have a holding in the previous Suncream case here that there was no 1581A jurisdiction. Certainly, and the recourse for Suncream was… No, no, but if there's no 1581A jurisdiction, right, that means that customs was not acting ministerially. It has to mean that. It goes to whether customs is actually rendering a scope determination, which is… I still want to stay with the language of our case law that binds us, ministerial as opposed to non-ministerial. Is that an issue in this case? It's not an issue in this case, Your Honor, no. It's on the cross-appeal. The basis for your cross-appeal is that the judge Kelly held that these goods were not already subject to suspension of liquidation because the act taken by customs was ultra-various, was unlawful. And the language of this regulation presumes that the original suspension of liquidation was legitimate. And this court set aside Judge Kelly's decision saying that the recourse for Suncream was to seek a scope ruling. No, no, I realize we set us up, but the same issue is here. You made the same argument in that other case. We didn't reach the merits in the other case. Certainly, Your Honor. The merits are here now. Her decision, which she repeated, excuse me, sir, in this case, on the ruling that we have in front of us on the scope order, she repeated the same analysis. So you can't run away from it. No, Your Honor, and I'm not trying to. You are indeed because you won't come to grips with what we have held that here customs made an interpretive ruling. Well, even if customs' actions were ultra-various, let's assume that for the sake of argument, that Commerce's instructions with respect to this case still does not need to be set aside because Commerce contemplated both scenarios, whether an entry is suspended or whether an entry is not suspended. Can Commerce piggyback onto the back of an illegitimate customs decision? Oh, Commerce didn't do that in this instance. Yes, they did. If Judge Kelly was right that customs' interpretation here was beyond its legal power, then its suspensions are of no effect. Commerce does not look at the actions of a separate government agency when it crafts its instructions. In fact, it's… But the problem is the law does. The regulation certainly has these two categories of entries, those that have been previously suspended and those that have not been previously suspended. Would you agree with me that when the regulation says, and the product in question is already subject to a suspension of liquidation, that that suspension of liquidation was lawful? Yes. I mean, that's certainly what that… Would you agree with me that if the suspension of liquidation was unlawful, then L-1 would not apply? We don't need to engage in this analysis of whether… It's hypothetical, sir. Certainly, Your Honor. If the suspension of liquidation was unlawful, the previous ones, then I assume that L-1 would be inapplicable in terms of trying to sweep those in. From Commerce's perspective, they would still apply L-1 because they wouldn't know. Commerce would have no way of knowing of whether a separate action by U.S. Customs and Border Protection was legal or illegal or ultraviolet or otherwise. I'm not trying to suggest that Commerce was contumaciously acting illegally when it simply looked and said, well, was there already an order of suspension of liquidation in this case? Yes, there was, therefore. What we're dealing with now is a lawsuit that's brought after Commerce enters that order and saying, even though Commerce may not have known it, they were relying on an unlawful customs determination and they aren't allowed to do that because doing it, in effect, gets you into EMS territory because it allows Commerce to create a retroactive order. We should look at how the regulations should be applied irrespective of some preemptive facts because they need to be applied consistently from one importer to the next. Whether or not Customs is behaving lawfully or not is totally irrelevant. Yes, Your Honor. Really? In terms of how Commerce… Can we go back a little? Sure. So your view, the government's position is Customs had the authority to do this. Customs, yes. Our position is that Customs had the authority to do this. And even though you can see that the order was ambiguous, the scope of the order was ambiguous, but Customs nonetheless has the authority to do what it did? Yes, Your Honor. Customs has the authority to do what it did. Is there anything in Supreme Law or Xerox that concerns you against bumping up against the decisions in those cases in terms of your view that Customs was actually not within its lawful authority? No. And in fact, I'll point the court's attention to… Before you've been discussed, does Customs have the authority to interpret or clarify a scope order? It does not have the authority to render a scope determination. So to the extent you're… Does it have, under the case law, does it have the authority to interpret or clarify a scope order? Yes or no? Well, that has very specific meaning, Your Honor, because that's what a scope ruling is, and Customs is not the agency delegated to render that kind of decision. It must protect the border, and as goods are coming in, it has to protect the public fix. But when it comes to interpreting or clarifying a commerce order, only commerce can do that. The case law says that. Yes, Your Honor. And I would just point… That's a yes answer. Yes, Your Honor. Commerce is the agency delegated to interpret its… So you want to either interpret or clarify, and in an instance where the government concedes that the order is ambiguous, when it's been held in this case, law of the case, that this order is ambiguous, then shouldn't we think that what Customs was doing was clarifying or interpreting the order in order to apply it to the goods? Customs, yes, necessarily has to look at the scope of the order when it's engaging in its law enforcement obligations when goods are coming across the border into the United States. But I would point the court to… It looks to me like what the law is saying is if Customs had any doubt, if there's any uncertainty, then what happens is you move to it. You don't suspend liquidation. You move. You go into the proceeding whereby you get the scope order. Well, this court held in… In dicta in Supreme 1, this court stated the statute does not prohibit, and the pertinent regulations clearly contemplate that Customs can suspend liquidation pre-scope inquiry. So that reflects an understanding… They can do it when they're ministerially, when they're in Xerox, when they're ministerially applying a scope order. Customs certainly has an obligation when goods are coming across the United States to do a preliminary assessment as to whether goods should be subject to an anti-dumping or counter-banning… Right, and if it's clear that they're in or if they're clear that they're out, they do that. If there's any doubt about it, then what Supreme 1 says, well, you should go get a scope rule. Yes, Supreme 1 held that, yes. But a corollary to that is you shouldn't, and if you read the legislative history of the very regulation you're relying on, there's all kinds of language about not being unfair to an importer where there's some doubt as to whether something falls within or without. Do you know that language in the legislative history of the regulation? I'm aware of that regulatory history, yes. So if there's some doubt at the border, Customs isn't certain whether it's in or out, needs to do some testing or whatnot, then you don't want Customs, you want to go get a scope ruling from Commerce. Yes, that's what Supreme 1 held. Meanwhile, you're not supposed to be suspending liquidation. Well, Customs does have the authority to suspend liquidation in that context. It's obligated to protect the public. Well, that's the issue in the case. And certainly Customs had that authority here. We're an outstanding anti-duty kind of thing where an order is in need of interpretation in order to know if it applies to a particular product. The case law suggests to me that Commerce, Customs should not suspend liquidation. If they do, Commerce can't later collect that. We would respectfully disagree, Your Honor, in that Customs does have the authority to suspend liquidation at the time of importation pre-scope inquiry. Even if what they're doing is necessarily applying even arguably an ambiguous... Yes, Your Honor. Yes, Your Honor. No, I've eaten into my colleague's time. I know. Well, we'll give him his three minutes if he needs it. Thank you, Your Honor. Absolutely. Thank you, Your Honors. May it please the Court. Perhaps I'll start on the last point as far as Customs' ability. And I'm here for SolarWorld, and I'm the attorney who helped draft the scope, and I'll talk about that later. But I'm here for the underlying policy, and it's very important that CBP has the ability to require deposits. They have to have the discretion to protect the revenue. And it's our position in this case that what Commerce... All they have to do, if they're in doubt, is call up Commerce and say, give us a scope ruling, and the whole procedure does it quick. But... First of all, it's not quick, but secondly, you've set up a dynamic... Because I think it's supposed to be prompt. Yes, but, Your Honor, you've set up a dynamic where the importer has no incentive to seek a scope ruling. Instead, they will import product for years, as was done in this situation. Right, and for years, Customs is passing this stuff in, saying, no, it's not within the scope of the order. Right, and so as soon as Customs identifies that there's an issue, and does the ministerial act that it did here, it should have the ability to begin collection of deposits. Who gets to ask for scope rulings? Does Customs ask for scope rulings? Anybody. The reality is... What does the regulations say? Any interested person. I believe any interested party. I can double-check it. Does that include Customs? I believe there can be an initiation by Commerce. I'll have to check, Your Honor. I apologize. Well, there's been a lot of conversation, and what, six opinions now that have issued that have all dealt with this, and it's perfectly clear that nothing prohibits Customs from picking up the telephone and calling Commerce and say, fire up your scope inquiry machine. That's true. That's true. But importers request the vast majority of these, and there needs to be the ability to protect the revenue from the first point where Customs realizes that there could be an issue. Right, but in promulgating the regulation, the promulgators realize it would be unfair to someone where there was some doubt about scope, when there's something applied, to actually require them to pay the duty up front. Your Honor, I don't think it's unfair for... That's what the legislative history of the regulation says. I think the way that scope rulings... Your Honor, I don't think that it's unfair to require the importer to seek a scope ruling and to protect the revenue at the earliest point where an issue is possibly raised. With regard to scope, I just wanted to underscore that Commerce found, based on the K-1 factors and the lower court found, that Suncream's products fall squarely within the scope. They are crystalline silicon photovoltaic products. They do contain a PN junction formed by any means, and that includes a junction that goes across the intrinsic layers, and they are not a thin-film product. Under the narrow exclusion that we petitioners drafted, these are a crystalline silicon product with a thin-film layer. They're not a thin-film product. So, and we agree with the government that Suncream conceded on several of those points throughout the process. So, thank you. Your Honor, if I could... Just to answer quickly Your Honor's question regarding who may request a scope ruling. So, in the regulation at 3-5-1-2-2-5-K-C-1, by application, any interested party may request a scope ruling. And Commerce can self-initiate a scope ruling as well. Customs and interested parties, then? That's a good question, Your Honor. I don't know why would they be precluded if Commerce can self-initiate, but as... Well, if they have this obligation that the government says they do, to stand there at the border and make the decision, and they can't decide whether it's in or out, you'd think that they can't perform their duty without knowing the answer, so they're an interested person? Yes. And in this case, in particular, and the opinion in Suncream 1 reflects this, the government acknowledged that the cells in Suncream's product contain amorphous silicon thin films. So, on their face, the cells were certified as a thin film product by a third-party accreditation agency. They contained thin film cells as the government conceded, and yet they went ahead and suspended and required cash deposits. So, what the government's interpretation here of the regulation is that an importer would have no recourse for an ultra-various suspension of liquidation by customs until there is the initiation of the scope inquiry. I'm not sure I'm clear on what you're saying. They have no recourse except if they prevail at the end of the day with Commerce, then they do have recourse. It's only if they... Yes. It's only they have no recourse if at the end of the day Commerce says, no, you're wrong. Yes, but in a case where the scope is ambiguous as it is here, where an importer has a lot of factual elements for a bona fide belief that his product is outside the scope, then customs should let the scope ruling proceed and not make a preliminary determination as to the scope. When you say let the scope ruling proceed, somebody has to request the scope ruling. Let's leave for a side whether customs does that as a routine matter or whether that's resources. The only way to force you or to create an incentive for you all to speak to the scope ruling is to do what customs did here, right? Well, and in fact, SOMPREME did file a scope ruling. First, it answered to Customs questions. So when Customs suspended the entries, it also issued several questions to SOMPREME and SOMPREME had to engage with Customs. So that is a process that normally takes time. Well, the problem you've got is a regulation has been written here on the cross-appeal that says that when a scope hearing is actually initiated, which it was here, and it's concluded and it's determined at the conclusion that the goods fall within the scope, then what commerce can do under the regulation is to say if the goods have already been suspended and liquidation, government keeps the money. Government keeps the money. And they did that to you and you're trying to say, no, the government can't keep that money. If you lose on your direct appeal, then going forward from the date that the scope inquiry was initiated, you're hooked, you know that. Correct, yes. What you're trying to say is assuming that you lose on the main appeal, you want the money back from the duties you paid from entry up until the date that the scope hearing was initiated. Yes, sir. You want it back. Yes. And your basis is, I believe, you think that under the case law, the suspension of liquidation here was ultra-various because customs are required to interpret or to clarify a regulation as opposed to apply it. Yes, and in this case, customs stepped into commerce's shoes and issued a determination that was not within the ambit of customs. They made... How do you draw the line between... You know the case law, right? I can talk shorthand. How do you draw the line between Xerox and, say, this case? What's the difference between a ministerial application judgment by a customs officer where this stuff falls within the order or falls out? What's the difference between that and one where a customs officer has to scratch his head a little bit and look at the goods, maybe ask somebody, and then decide they're in? Well, in this case, commerce's... The scope was ambiguous, and in this case, essentially, commerce's scope determination... When you say the scope was ambiguous, is that... Did someone hold that? Has that been decided? Is that a data point that's locked down or is it debatable? It is... On the face of the order, it covers crystalline cells, and it excludes... This is an order that also has a specific exclusion for amorphous cells, whereas the cell that came in from Sunprime, it's a cell that has both components. It is a hybrid cell. So on its face, it should have been clear to customs that if this is not a crystalline cell, well, there is a good reason for the exclusion here. The documentation shows a very good reason for the exclusion. So it is not the situation in Xerox which was more, let's say, a plain vanilla situation, as my colleague would suggest. But just going back, one very last point very quickly regarding hybrid cells and regarding the thin film exclusion. This case, whether the Sunprime cell is covered by the order, would have maybe been a closer case if it weren't that SolarWorld was asked directly during the ITC conference whether hybrid cells that contain an amorphous silicon component and a crystalline component should be covered by the order. And SolarWorld essentially responded that they are aware of this technology, the hybrid technology. It is proprietary and it's limited. And in particular, they said, we have no problem competing against Sanyo Panasonic. The example at the time was the Sanyo Panasonic HIT cell, which is a hybrid cell. Now in the context of a material injury investigation, a statement, we have no problem competing against this product, the hybrid cell, can mean only one thing. It means that importation of this product is not the cause of material injury. And this court in FedMed found that when a petitioner, FedMed resources found that when a petitioner is asked to clarify the scope of its order, it has to provide a very precise and direct answer and that such an answer will be germane and a next, it will be highly germane where the actual quote in a subsequent scope determination. Thank you. Thank you, Your Honor. Your Honor, I know I've run over my time. Yeah, no, no, no. We'll give you a couple minutes if you need it. And obviously you understand this is exclusively with respect to the cross-appeal question. Certainly, Your Honor. And what your friend said in response to that. I just wanted to note that interested party is a statutory term. It's defined in 19 U.S.C. 1677-9. And it has a list of the entities that can be an interested party. Well, don't hold us in suspense. Does it include customs or not? So in short, commerce can self-initiate, but customs is not an interested party. That's not to say that customs doesn't have the pragmatic abilities, you know, certainly to raise the attention to commerce and commerce in its own volition could decide to self-initiate. Subsequent to this case, a separate statute did come into effect that gives customs greater flexibility of referring matters. But at the time when these merchandise came in, that statute did not exist. But what I think is important here is to look at the regulatory framework outside the context of sunscreen because customs and commerce is going to have to administer these regulations. Is this cross-appeal? This is the cross-appeal. Yes, Your Honor. So it would be inappropriate for commerce to assess the propriety of a separate agency such as U.S. Customs and Border Protection and their prior actions when it's drafting its instructions, which is why in this case their instructions merely mirrored the language of the regulatory scope. And to the extent that customs ended up getting it wrong, which we now know it didn't, but if it had, the way that commerce drafted its instructions would have accounted for that because the entry would have falled into one or two categories, either a suspended entry or a non-suspended entry, and the instructions provide for both. Thank you. Thank you. Thank you. Thank you.